# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5435 | **DATE** | 9/22/2004 |
| **CASE TITLE** | Bruce Hardy vs. Housing Authority of Cook County | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the foregoing reasons, defendants' motion for summary judgment is granted, and judgment is granted to the defendants on all counts.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | SEP 23 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 23 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | SEP 23 2004 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| TP | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| BRUCE HARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 02 C 5435 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| | ) | |
| HOUSING AUTHORITY OF COOK. | ) | |
| COUNTY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |



DOCKETED
SEP 2 3 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce Hardy worked for the Housing Authority of Cook County (the "Authority") for almost 18 years. During his career, he generally received positive reviews, and eventually worked his way up to the position of Director of Management.[1] In this job, he reported only to the Executive Director, James Floyd. In May 2001, however, things began to change when the Authority created a new position of Deputy Executive Director and appointed Terry Corcoran to this position. Hardy now reported to Corcoran rather than Floyd.

This appointment led to conflict as Corcoran and Hardy disagreed fundamentally about how the Authority should be run and specifically about how Hardy should do his job. In

---

[1] Hardy states in his brief that he took continuing education courses periodically and that he received substantial recognition from the Housing Authority and various educational and professional organizations. For example, he states that he was selected as a member of the United States Delegation to the 48th Session of the Committee on Housing, Building and Planning of the United Nations Economic Commission for Europe in Geneva.

-1-

December 2001, this conflict came to a head when Corcoran gave Hardy a strongly negative mid-year evaluation that faulted Hardy for not carrying through with a number of duties that Corcoran had assigned him. Hardy was upset and responded by criticizing the management of the Authority in several memos and in two meetings. His criticism focused entirely on Corcoran who Hardy believed was unqualified for the job and was trying "to sabotage and destroy public housing's high performance standards and to discredit its employees." Hardy claims that he made these accusations because he genuinely believed that Corcoran was instituting changes that were detrimental to the Authority and to the low-income tenants served by the Authority. The Authority believes that Hardy was merely raising these allegation to deflect attention from his poor performance. Eventually, Corcoran recommended to Floyd that Hardy be fired. On March 15, 2002, Floyd terminated Hardy's employment.

Hardy filed a five-count complaint in this Court against the Authority, Corcoran, Floyd, and six individual members of the Board of Commissioners. Hardy alleges that his firing violated the due process because he did not receive any notice or a pre-discharge hearing and violated the First Amendment because he was fired for speaking out on matters of public concern. Hardy also asserts a claim for retaliatory discharge under state law. Defendants have filed a motion for summary judgment on all counts. For the reasons set forth below, the motion is granted.

## BACKGROUND

On May 1, 2001, Terry Corcoran was promoted to the position of Deputy Executive Director. Several weeks later, he met with Hardy for several hours. According to Corcoran, he discussed areas that Hardy needed to improve and identified areas in which Hardy required

assistance. After this meeting, Corcoran communicated with Hardy on a regular basis and discussed with him various items that required Hardy's supervision.[2]

In December 2001, Corcoran conducted a mid-year review of all managers who reported to him (including Hardy). Corcoran gave Hardy his mid-year evaluation in a memo dated December 3, 2001. It is fair to say that this memo was critical of Hardy's work. The first paragraph states:

> During the course of the past seven months we have identified many issues that are in need of attention within the Public Housing program. Some of the items have been sufficiently addressed and completed. However, a vast majority of them have had no significant progress to speak of. I am concerned that these items are not being given the priority that they require. For that reason, I will detail some of the items below along with the dates that they were discussed.

The memo contains 34 bullet points, summarizing specific tasks that Corcoran believed needed to be addressed. It concludes by stating that "there are several areas that have not been given adequate attention" and that Hardy's "follow-up and progress rate [] ha[d] not met [Corcoran's] expectations."

The memo upset Hardy, and he became worried that this evaluation "might [be] the first step down the road leading to [his] termination." (Hardy Aff. ¶ 20.) During the next several weeks, he took several steps to try to keep his job. He consulted a lawyer. He also prepared two memos that he would later submit to Corcoran and Floyd: (i) a memo to Corcoran entitled "Rebuttal of Mid-Year Evaluation" dated December 26, 2001; and (ii) a memo to Floyd and Corcoran entitled "Time to Blow the Whistle" dated January 8, 2002.

---

[2]Corcoran claims that he was often dissatisfied with the responses Hardy gave about how much progress had been made on these various items. Hardy states that, until his mid-year evaluation in December, Corcoran never told him that he was dissatisfied with his work.

The December 26th rebuttal memo begins by pointing out that Corcoran's mid-year evaluation overlooked many duties performed by Hardy. It then states that Corcoran has instituted 36 new orders for the public housing staff. Although the memo contains a point-by-point rebuttal to each of Corcoran's many criticisms, the gist of the memo is that Hardy has not completed all the assigned tasks because he does not have enough time and because many of these tasks are not in his assigned job duties. For example, Hardy repeatedly states that he will begin working on a certain task only after "I complete jobs specific to my job description." One issue that Hardy was particularly upset about was Corcoran's decision to require monthly meetings. He called this decision a "disaster" and asserted that the group meetings he had been using previously were "far superior" to Corcoran's suggested approach. The memo ends with the following summary:

> As *Director of Management*, I should not be given jobs outside of my job description. I should be allowed to direct this department as I have done in the past. *Recent changes you've made have been a disaster for Public Housing.*

> As I said in the beginning, in this *Mid-Year Evaluation*, you missed most of the work we do as part of the job description, and you have assigned work that is not in our job descriptions.

(Memo at 4; emphasis in original.)[3]

The January 8th "whistle-blowing" memo is harshly critical of Corcoran as illustrated in the opening paragraph:

> Terrance Corcoran set out right from the beginning to sabotage and destroy public housing's high performance standards and to discredit its employees. Why he is

---

[3]Hardy attached to this memo a two-page job description, which was submitted to bolster his claim that many of Corcoran's assigned duties were not part of his job description. Interestingly, however, item no. 14 states that one of Hardy's duties was to perform other duties "as assigned."

doing this, I don't know, it could be to place friends in our jobs, it could be political or maybe he just doesn't like older employers.

(Memo at 1.) The memo specifically complains that Corcoran negotiated a "horrible lock box deal" with LaSalle Bank regarding the collection of rent payments; that Corcoran fired the Authority's 30-year business association with the law firm of Brunswick, Keefe and Jacobson LLC and hired another law firm that submitted a higher per case bid; that Corcoran fired Barbara Harris, who worked in the computer department; and that Corcoran imposed too many job demands while at the same time requiring staff to attend unproductive meetings (which Hardy described as the "Sandbagging technique").

Armed with this two memos, and a third memo describing his positive contributions to the Authority, Hardy sought to meet with Corcoran and Floyd. On January 9, 2002, Hardy came to the Authority along with his attorney.[4] But Corcoran told him that the mid-year review was an internal matter and that it was inappropriate for counsel to be present. Hardy states that Corcoran and Floyd specifically told him that "there was no disciplinary action pending." No meeting was held on this day, although Hardy apparently then submitted the three memos to Corcoran and Floyd.

The Authority then ordered Hardy to appear at a meeting three days later on January 11th. Prior to the meeting, Hardy asked Floyd if his attorney could attend. Floyd said no and Hardy then asked if a court reporter could be present so that all exchanges of information would be recorded accurately. Floyd again said no.

---

[4]This attorney was Hope Keefe of the Brunswick law firm which had been fired by the Authority. Keefe is also Hardy's current attorney in this case.

At the January 11th meeting, Corcoran discussed some of the criticisms listed in the mid-year review. During this meeting, Hardy raised a new issue. He stated that he had information regarding monetary improprieties at the Authority and that he and other unidentified individuals were looking into the issue.

A second meeting was held on February 4, 2002. This time Floyd and Patricia Emanuel, who was the Authority's director of human resources, also attended. Hardy further elaborated on his earlier charge, stating that some of the monetary improprieties he alluded to could be criminal and might eventually go to court. However, he again provided no specific details.

After this meeting, Floyd and Corcoran decided that they should follow-up and seek more information regarding Hardy's allegations of financial improprieties. Floyd and Hardy then exchanged e-mails over the next couple of weeks.[5]

On February 8, 2002, Floyd e-mailed Hardy asking for more information concerning the allegation about "the money." Floyd stated that he was "very concerned that you would make such an allegation insinuating that you had knowledge of some impropriety about money but refuse to disclose this information to me." On February 13, 2002, Hardy e-mailed back to Floyd:

> The information uncovered thus far involves the inappropriate use, missing, and public funds being used to influence private business deals. This effort is part of an ongoing private investigation that I and others, who wish not be identified at this time, are conducting. When this investigation is complete, we will make all results known to individuals or organizations that we feel will best serve this Authority, the employees and its residents.

(*Id.*)

---

[5]Copies of the four emails were submitted to the court, and plaintiff has admitted that they are true and correct copies.

Floyd was not satisfied with this response. On February 15, 2002, he again e-mailed Hardy. This e-mail was more forceful and "ordered" Hardy to disclose "every detail" of the allegation, including the names of the others involved in the investigation. On February 19, 2002, Hardy e-mailed the following (in full):

> Regarding the misuse of money.
>
> I believe that the Chicago Heights J.E.M. Company has double billed this Authority for a period of at least ten (10) years, from 1985 to 1995. If we could pull those purchase orders and invoices I am sure that we will find some duplications. Persons who agree with me regarding this information before they left are Art Davis and Bill O'Brien. That's all I know.

(*Id.*).

Floyd and Corcoran then decided that Hardy should be fired. In his affidavit, Corcoran stated that Hardy was fired based on his "unprofessional response to his mid-year review, his poor supervisory and leadership skills and his unfounded, serious allegations regarding the misuse of Housing Authority funds." Hardy was fired without being given any hearing or formal notice that he would be fired.

## DISCUSSION

Although the complaint contains five counts, the focus of the briefs is on the First Amendment retaliation claim set forth in Count IV. Plaintiff claims that the was fired primarily because of the criticisms made in his January 8th "whistle-blowing" memo and in his December 26th rebuttal memo. We therefore address that claim first in Section I below and then address the remaining claims in Section II.[6]

---

[6]Defendants brought this summary judgment motion based on several grounds, one of which is that the individually named defendants are entitled to qualified immunity. Along with the initial motion, defendants moved to stay discovery based on the assertion that the court

## I.      First Amendment Retaliation Claim.

### A.      The Legal Standard.

Three steps are involved in analyzing a First Amendment retaliation claim in the public

employment context:

> First, the court must determine whether the employee's speech was
> constitutionally protected under the *Connick-Pickering* test. Second, the plaintiff
> must establish that the speech was a substantial or motivating factor in the
> retaliatory action. Third, the defendant has an opportunity to establish that the
> same action would have been taken in the absence of the employee's protected
> speech.

*Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004).

The first step – whether the speech is protected under *Connick-Pickering* test – is a two-

part inquiry. *Id.* First, the court must determine whether the speech "addressed a matter of

public concern." *Id.* at 698. Second, assuming the first step has been met, the court must

determine "whether the government's interest as an employer in providing effective and efficient

services outweighs the employee's interest as a citizen in commenting upon the matter of public

concern." *Id.* This two-step process is question of law for the court. *Id.*

----

should decide the issue of qualified immunity before discovery. This motion was granted. In the
ensuing briefing, however, the issue of qualified immunity faded into the background as the
parties focused primarily on whether plaintiff could prove that any constitutional violation took
place. Plaintiff submitted affidavits and other evidentiary materials in support of his arguments
on the merits and vigorously argued in his briefs that he had shown, based on these same
materials, that there was a genuine issue of material fact. With only one specific exception,
plaintiff never suggested that he was hampered by any lack of discovery. The exception
concerned plaintiff's assertion that he had not yet been able to determine the precise role played
by the individual Board members. (Resp. at 11-12.) This lack of discovery, however, is
immaterial given that this Court's ruling does not rest on any determination regarding the
Board's role in any alleged conspiracy. Aside from this issue, plaintiff has not pointed to any
specific issue on which he needs further discovery.

As set out by the Supreme Court in *Connick*, to determine whether speech addresses a matter of public concern, the court must look at "the content, form, and context of [the speech], as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). It is often stated that content is the most important of the three factors, *Sullivan*, 360 F.3d at 699, and most courts begin by making an initial examination into the content of the speech, asking whether it "can fairly be said to relate to a matter of political, social, or other concern to the community." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002). Various issues have been considered to be "of concern" to the community. *See, e.g., Sullivan*, 360 F.3d at 700 (chronic time abuse by public employees); *Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004) ("our cases have consistently held that speech alleging government corruption and malfeasance is of public concern in its substance"); *Wainscott v. Henry*, 315 F.3d 844, 850 (7th Cir. 2003) (comments criticizing City's placement of dumpsters); *Gustafson*, 290 F.3d at 907 (comments about police protection and safety).[7]

On the other hand, some topics have not qualified as a matter of public concern even under this fairly lenient initial analysis into content. The Seventh Circuit has stated that "[c]omplaints about personnel matters generally do not address a matter of public concern." *Sullivan*, 360 F.3d at 699. Also, statements about "how" tasks in an office "should be carried out" are generally not matters of public concern. *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th

---

[7]The inquiry is sometimes formulated in terms of whether the speech in question would be protected if it had been made by a private citizen in a newspaper editorial. *Wales v. Bd. Of Educ. Of Comm. Unit School Dist. 300*, 120 F.3d 82, 84 (7th Cir. 1997) ("If a newspaper ran an editorial arguing that [the school] should not be an 'inclusion facility,' or that disruptive kids should be removed from classrooms so that others may learn, that expression would be protected by the first amendment.").

Cir. 2000); *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 975 (7th Cir. 2000) (police officer's statement criticizing department's decision to allow officers to only carry one pair of handcuffs instead of two was merely a complaint about "a change in equipment allocation" ). Courts have been concerned both about second-guessing personnel decisions and also about the possibility that any workplace disagreement, no matter how small, could be wrangled into a public issue. *See Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988) ("If every facet of internal operations within a governmental agency were of public concern, and therefore any employee [] comment upon such matters constitutionally protected, no escape from judicial oversight of every government activity down to the smallest minutia would be possible."); *see also Connick*, 461 U.S. at 147 (noting that a federal court generally is "not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency").

Although content is considered the most important factor and is usually analyzed first, courts rarely rely on content alone and almost always also look at context, form, and motive to supplement the analysis. As the Seventh Circuit has stated, "speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in *Connick.*" *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999). The reason is that an employee may speak out on a public issue to gain advantage in a personal workplace dispute. *Id.* This scenario played out in *Connick* where an attorney criticized the discipline and morale in her office shortly after being told she would be transferred to another department that she did not want to work in. Rather than focusing solely on content, the Supreme Court looked at the "focus" of the speech and concluded that the employee was merely speaking out to "gather ammunition" against her supervisors:

> While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of [plaintiff's] questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause celebre.

461 U.S. at 148.

To address this concern, the Seventh Circuit has instructed courts to "delve deeper" beyond content and to look at the "point" of the speech: "was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Kokkinis*, 185 F.3d at 844 (7th Cir. 1999) (quoting *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir. 1987)). If this deeper examination reveals that the employee spoke "merely for personal reasons rather than a desire to air the merits of the issue, or [spoke] for the sole purpose of bolster[ing] [his] own position in a private personnel dispute with [his] superiors," then the employee's speech is not entitled to First Amendment protection." *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996) (internal citations omitted).[8] Each case is, of course, highly fact specific and the Seventh Circuit has mentioned other specific factors that are relevant in trying to determine whether the point of the speech was primarily personal. Some of these factors will be discussed in the analysis below.

---

[8] At the same time, the Seventh Circuit has cautioned that "the fact that [plaintiff] had a personal stake in expressing his views does not, by that reason alone, remove his expression from First Amendment protection under *Connick*." *Campbell*, 99 F.3d at 827. It is not always clear where to draw the line in dual-motive cases where an employee may have both a personal and public motive. Based on the quotation from *Campbell* set forth in the text above, it appears that the employee loses First Amendment protection when the personal motive is the primary or dominant one.

**B.    Application of the Legal Standard.**

At issue in this case are Hardy's comments made in the two memos and also the charges of financial impropriety made in the subsequent meetings and related e-mails.  Hardy argues that he came forward with these allegations based on a genuine concern for the well-being of the Authority, his concern for the plight of tenants, and his desire to help out co-workers who had been unfairly fired or criticized.  He claims that his personal interests were minimal in comparison to these public concerns.

Initially we look at content.  Some of the statements made by plaintiff clearly constitute matters of public concern, the strongest being the allegation that the Authority was engaging in criminal financial improprieties.  Hardy's allegation that the Authority did not accept the lowest-bidding law firm and his charge that Corcoran unjustifiably fired employees probably also would qualify under this initial review.  Likewise, many of his more general allegations – such as the claim that Corcoran was trying to "sabotage and destroy public housing" – also qualify as matters of public concern.

Other criticisms, however, fall closer to the side of the continuum dealing with non-constitutional personnel disputes over "how" tasks should be carried out.  *Taylor*, 214 F.3d at 792.  In particular, Hardy states in his response brief that the "principal matter" raised in his memos was the "number and nature of additional assignments" imposed by Corcoran.  (Resp. at 5.)  Although Hardy tries to frame this issue in public terms, by arguing that overworked employees could not complete tasks "closely related to tenant welfare," this is a stretch and raises the problem, noted by the Seventh Circuit, that any issue could be indirectly linked to the public issue of whether the office was adequately performing its mission.  *Berg*, 854 F.2d at 242.

Likewise, we find that Hardy's criticism of Corcoran's requirement to hold monthly meetings, rather than following Hardy's alternative approach, is a internal management dispute over how to effectively manage employee time.

In any event, whether or not the latter topics survive this initial scrutiny into content is not really important given that a deeper examination of the record as a whole demonstrates that Hardy raised these criticisms primarily for the purpose of gaining leverage in his employment dispute with Corcoran. As such, none of them addresses a matter of public concern.

First and most importantly, there is a close factual and temporal connection between Hardy's negative mid-year evaluation (*i.e.* the personal dispute) and his later comments. To summarize, Hardy received a negative mid-year evaluation on December 3rd. By his own account, he was worried that this evaluation was the "first step down the road leading to [his] termination." It is clear that he was worried because he consulted an attorney about these issues. It is in this context that he decided to draft the rebuttal and whistle-blowing memos. His focus at the time was on keeping his job. He drafted these memos only a few weeks after the negative review and as part of an anticipated meeting about his negative review.

This close connection is, by itself, strong evidence that his primary motive was to gain leverage in his dispute over his mid-year evaluation. This case is thus factually close to *Cliff v. Board of School Comm. of City of Indianapolis*, 42 F.3d 403 (7th Cir. 1995) where the Seventh Circuit held that a teacher's comments criticizing school policy – comments that would clearly constitute a matter of public concern if content were the sole guide – nonetheless were not protected by the First Amendment primarily because the teacher complained "only in response to

criticism directed at her classroom performance in her annual reviews," thus indicating that her motive was really personal. *Id.* at 410-11.

Second, not only is there a close connection between Hardy's critical comments and his negative review, there is also no countervailing explanation as to why he came forward with his various criticisms during this same time period. The January 8th memo is provocatively entitled "Time to Blow the Whistle," raising the question as to why *this* particular time. Plaintiff never offers any explanation even though many of his allegations concern events that took place well before he decided to come forward. As plaintiff admits, his principal criticism was that Corcoran imposed too many work assignments. But this alleged problem existed soon after Corcoran took over in May 2001. Why did plaintiff then wait until January 8th to speak out on this problem? Likewise, plaintiff first stated in the February 4, 2002 meeting that he was investigating charges of financial improprieties. But what prompted him to start an investigation? He later revealed that the investigation concerned a vendor who allegedly double-billed the Authority from from 1985 to 1995. Why did it take over six years for this issue to surface? Was there a sudden and unexpected disclosure made to plaintiff at the same time as his dispute with Corcoran was coming to a head? Plaintiff offers no explanation for this coincidence, leaving us to conclude that he decided to investigate and disclose these matters at the time that he did in order to "gather ammunition" in his burgeoning dispute with Corcoran.[9]

_____

[9]This case thus differs from those cases where the plaintiff came forward in response to a an external stimulus not under his control or where the plaintiff came forward against his own self-interest. *See, e.g., Sullivan*, 360 F.3d at 700 (speech was made "in the aftermath of an investigation by the Illinois State Police of possible time abuse in the Bureau."); *Wainscott*, 315 F.3d at 850 (comments were made "in direct response to a situation evolving before [the employee]"); *id.* at 850-51 ("other than his interest as a taxpayer, [plaintiff] had no personal or pecuniary interest in the placement of dumpsters, or for that matter, in the management of the

-14-

Third, although the whistle-blowing memo raises various issues that are of public importance, these issues are framed in terms of plaintiff's personnel dispute with Corcoran. In determining whether an employee had a personal motive, the Seventh Circuit has sometimes looked at the way in which the statement is "expressed" to see whether it addressed "only the personal effect upon the employee." *Marshall v. Porter County Plan Comm.*, 32 F.3d 1215, 1219 (7th Cir. 1994). If the ostensibly public speech is tied to and related back to the personal effect that the issue has on the employee, then it is more likely that the speech was made for personal reasons. *See, e.g., Cliff,* 42 F.3d at 409 (teacher's criticism of school policies was "addressed only to the personal impact of those issues" on her).

Here, it is clear that the central purpose of the January 8th memo was to demonstrate that Corcoran was unfit to perform his job. The memo is directed at Corcoran, not the Authority generally or even Floyd. The purpose for this attack is also obvious – namely, to undermine the legitimacy of Corcoran's criticisms of Hardy in the mid-year review. This conclusion is illustrated by the following paragraph:

> Mr. Corcoran has never worked as an employee of public housing; he's never been a manager, an area manager or the Director of Management. He does not know what we do and should not be in charge. He certainly isn't capable of evaluating experienced employees.

(Memo at 1.) This passage is telling in that it starts out with a more general charge that Corcoran is not fit for his job but then closes by linking this criticism back to Hardy's dispute by stating that Corcoran "isn't capable of evaluating experienced employees." Similarly, although Hardy

---

city as a whole"); *Campbell*, 99 F.3d at 828 (police officer was "willing to give up his recent promotion in order to dissociate himself from the C.O.P.S. program, and the [whistle-blowing] memorandum was written with that purpose in mind").

criticizes Corcoran for supposedly negotiating a horrible lock box deal with LaSalle Bank, Hardy

ultimately again ties this criticism back to a personal issue by stating that Corcoran's mistake was

that he failed to "consult[] the staff that have the experience" – *i.e.* the vague reference clearly

again referring to Hardy himself.[10]

Fourth, Hardy raised his comments only to his immediate supervisors and made no effort

to speak more broadly. *See Taylor*, 214 F.3d at 792 ("all of the questioned speech took place

within the employer's personnel hierarchy" and thus should be considered merely "work-

related"); *Wales*, 120 F.3d at 84 (teacher's decision to complain only privately to her supervisors

"supports an inference that the real concern is the employment relation"); *cf. Gustafson*, 290 F.3d

at 907 (police officers talked not only to supervisors, but also to fellow officers and the

president).[11]

Finally, Hardy's criticisms have a scattershot quality to them that also suggests his motive

was personal. Many of his most scathing criticisms are general and vague and are not tied to

concrete facts. *See Spiegla*, 371 F.3d at 937 (giving more credence to speech that was "not based

on rumor or mere hunch"). Moreover, as noted above, he made many and varied criticisms

---

[10]Even some areas that might not seem at first glance to involve a personal aspect, such as
the issue about which law firm to hire, did have a connection to Hardy. Specifically, Hardy
complained that the decision to hire the new law firm had the effect of "relieving management
staff from legal responsibilities." (Memo at 2.) Although Hardy uses a general term
(management), it is again clear from context that he is the person most affected.

[11]We do not place much weight on this particular factor because it is not entirely clear how
much weight it should be given. Although the Seventh Circuit has found it to be significant
in some cases, as noted above, it has also noted that an employee "who attempts to follow
internal mechanisms to resolve important issues should not automatically be treated less
favorably than the individual who immediately turns to the press or public forum." *Spiegla*, 371
F.3d at 937-38.

dating back to as far as 1995. Significantly, he first came forward with various criticisms in his "whistle-blowing" memo but he did not at that time mention the most serious charge of all, which is the allegation of criminal financial improprieties. Why did he wait several weeks later to raise this charge?

In particular, the exchange of e-mails between Hardy and Floyd on this topic are illuminating. Hardy first responded with a strong and unequivocal statement; however, when pressed for more details, he backed away substantially. Specifically, in his first e-mail of February 13th, he states unequivocally that he and other individuals "are" investigating "the inappropriate use, missing, and public funds being used to influence private business deals." This is a serious charge. However, in his subsequent e-mail a week later, in response to Floyd's demand for specific details, he states that he "believes" that a vendor double-billed the Authority. He suggested that this issue could be dealt with by looking at some purchase orders and invoices. He finally states that there are persons "who agree" with him on this but that they left the Authority at some undisclosed earlier point in time. The latter e-mail raises doubts as to whether there really were others *currently* investigating the claim, whether the charges were as serious as first claimed, and whether Hardy had any concrete evidence or had actually even done any investigating at all. If Hardy was really trying to bring wrongdoing to light, as he claims, why was he so coy about revealing the underlying basis for his charges?

The fact that Hardy states in an affidavit that he was concerned about the tenants, rather than his job, when he wrote these two memos is not dispositive because, as set forth above, the record as a whole undermines this claim. *See Cliff*, 42 F.3d at 410 (affirming summary judgment for defendant because the "record as a whole belies [plaintiff's] assertion that she spoke in order

-17-

to call public attention to the problems addressed."). Not only does the record contradict plaintiff's current claims, his own earlier statements do so as well. Plaintiff now states in his response brief (at 7) that he was not concerned about his job when he wrote these memos because he "had a good job" and "had not been threatened with any disciplinary action." But plaintiff's affidavit and complaint both state that at the time he wrote these memos he "feared he might be subject to disciplinary action." (Cmplt ¶ 12.)[12]

In sum, we find as a matter of law that plaintiff's speech was not addressed to a matter of public concern. Having concluded that plaintiff's speech does not address a matter of public concern, we see no need to further analyze the additional steps in the inquiry that plaintiff would need to overcome to establish his claim. Therefore, we grant summary judgment to defendants on the First Amendment claim (Count IV).

## II. Other Counts.

Plaintiff asserts two claims (Counts I and II) for violation of his due process rights. He claims that he should have he was not given any notice that he was being fired nor was he given a hearing or chance to present his side of the story. Defendants move for judgment on these

---

[12]Plaintiff's argument here rests on his testimony that Floyd and Corcoran stated on January 9th that plaintiff did not need a lawyer because "there was no disciplinary action pending." Plaintiff thus appears to be making a distinction between being "threatened" with disciplinary action versus "fearing" disciplinary action. We fail to see any salient differences between the two. In any event, if there are any differences, plaintiff's own perceptions are more relevant. Moreover, plaintiff could not have been relying on Floyd's and Corcoran's statements that no disciplinary action was pending because those comments were made on January 9th – *after* plaintiff had already written his memos. In short, when he wrote these memos, plaintiff clearly was worried about his job, and his after-the-fact statements now that he was acting primarily out of altruistic motives are at odds with all the objective evidence.

counts, asserting that Hardy had no constitutionally protected property right given that he is an at-will employee. We agree.

The parties agree that there is no contract right contained in the personnel manual. It is also undisputed that there is no written contract of employment or at least no copy that can now be found. Plaintiff therefore argues that he had an oral contract. He states that, when he was initially hired in 1984 by Victor Walchirk, who was the Executive Director at that time, Walchirk "outlined" the terms of this contract. These terms allegedly included, among other things, a starting date of February 4, 1984 and a "contemplated ending date of [Hardy's] normal retirement date, which was August 1, 2005. However, Hardy's claim that there existed a contract for lifetime employment is not valid because it is an oral contract, which violates the statute of frauds. *See Miller v. Ford Motor Co.*, 254 F.Supp.2d 1024, 1025 (N.D. Ill. 2003) ("oral contracts for lifetime employment are barred by the Illinois Statute of Frauds").

Plaintiff's other theories are likewise untenable. He attaches an April 3, 1985 memo from Walchirk to the Section 8 coordinator stating that, "[i]n accordance with a recent U.S. Supreme Court decision, permanent, non-probationary public employees are entitled to a pre-discharge hearing before they are terminated." But this vague memorandum was written to a different department (Section 8 employees) and not to plaintiff's department (public housing employees). Plaintiff points to a collective bargaining agreement that provides a right to a hearing but he was not a union employee. Finally, plaintiff makes various arguments stating that he was an 18-year employee and should have been treated more fairly and not fired so abruptly. This may be true but it does not establish a property right implicating the due process clause.

We also grant judgment to the defendants on Count III, which is a conspiracy claim that rests on the same underlying allegations in Counts I, II, and IV. Because we have concluded that plaintiff has not established a genuine issue of material fact on those claims, he therefore cannot bring a conspiracy claim based on those same allegations.

Finally, in Count V, plaintiff asserts a state law claim for retaliatory discharge. The Authority argues that we should not exercise supplemental jurisdiction over this state law claim or that, alternatively, the claim fails under the Illinois Tort Immunity Act. We need not analyze the latter argument as we decline to exercise supplemental jurisdiction.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted, and judgment is granted to the defendants on all counts.

**ENTER:**

JOHN A. NORDBERG
**Senior United States District Court Judge**

**DATED:** September 22, 2004